May it please the Court, I am Melinda Davison and I'm here on behalf of the Industrial Customers of Northwest Utilities, known as ICNU. ICNU is a non-profit trade association that represents the interests of industrial customers on Northwest energy issues. Okay, now can I ask, since there are multiple appearances on both sides, are you all dividing time or what? Yes, Your Honor. We have divided, for the petitioners, we had 30 minutes and each petitioner has agreed to 10 minutes. All right, see, I said 10 minutes per summary. All right. Thank you. We are challenging the validity of the power sale contract between Clallam, PUD, and BPA that was entered into for the benefit of Court Townsend Paper. ICNU is asking this Court to set aside this contract because it violates the express terms of the Northwest Power Act. BPA sold the power at a rate that is specifically prohibited by law. BPA, for the first time in 27 years, has chosen not to follow the requirements of the new large single load. Let me back up for a minute on jurisdictional issues. Are we dealing with rate issues at this point or are we not because they haven't gone through FERC yet or have they? Your Honor, we are not dealing with rate issues. You just complained about the rate at which they sold it. It is not a rate issue in the traditional rate sense. Basically, we're not challenging the validity of the rate. BPA has a series of categories of rates that charge to different types of transactions. So this is not a situation in which BPA has promulgated a rate that has to be approved by FERC. This is, the rate is in a place. It is our contention that BPA has applied the incorrect rate to this particular contract. A categorization as opposed to the rate itself. Yes. That's right, Your Honor. Does that have to do with the new large single load? Yes, Your Honor. Can I ask you something about Section 839A13, the one that defines, everybody calls NLSL, new large single load. It says, any load associated with a new facility, an existing facility, or an expansion of an existing facility, A, which is not contracted for or committed to, as determined by the administrator, by a public body, cooperative, investor-owned utility, or federal agency customer prior to September 1st, 1979, and which will result in an increase in power requirements of such customer of 10 average megawatts or more in any consecutive 12-month period. If Calum, isn't Calum a public utility? Yes, Your Honor. So why, it says, which is not contracted for or committed to by a public body. Isn't it contracted or committed to a public body? I'm, obviously I'm misreading this. I'm trying to get your guidance as to what you think this means. Yes, Your Honor. Basically, what that language is referring to is the industrial customer load. And so, when this act was passed, there was a recognition that existing industrial customers would have the contracted for or committed to status. And so, they would, in effect, be grandfathered in and not subject to the new large single load. It is new industrial customers who have come onto the system since 1979 that if they are over 10 average megawatts, that they get that designation of new large single load, which then requires that that load be served at the new resource rate, which is the higher rate than, much, much higher than Bonneville applied in this contract. And that is the essence of our argument, which is very straightforward. What Bonneville and Port Townsend Papers say is that, well, we're going to focus on the, you know, just a couple of words in this particular statute. And we're going to argue that because we're providing surplus power, that it is not power requirements, taking those two words out of the statute. Power requirements is not a defined term in this statute. It basically has common, understandable meaning that you would associate with that. And essentially, what the statute means is that if you have, you have CLAL and PUD, they have now, for the first time, taken on Port Townsend Paper as a new customer. That has increased the power requirements by approximately 16, I mean, 17 average megawatts. That is, that is what the. If you don't, how do we know that? I mean, for all we know, they, there's another 17 megawatts that they've lost to something else. In other words, if you, if it's not, it's true that it's not using a term that's anywhere defined. It's not, so the equation with firm load is kind of an implication. But if it's not that, then how do you determine whether there's an increase in power requirements? CLAL and PUD has an obligation to let Bonneville know if they have an increase in their load requirements. And basically. What if the question is just use more load this year? Well, again, this particular provision that that issue here is not dealing with the overall CLAL and PUD load. It is designed to apply to a specific industrial customer coming on to their system. Right, but my point is that it doesn't say that either. It says it will result in an increase in power requirements. Presumably, an increase over what? An increase over what it would have otherwise been? An increase over what it would have been in the past? An increase over what? Well, it's referring to the increase of this new industrial customer coming on to the public utility system. And so, if that new industrial customer is 5 megawatt and they're. And what if another, another industrial customer left at the same time who had an equivalent amount? Would that be an increase in power requirements or not? Your Honor, that would have no bearing because basically the intent of Congress with the passage of this act was to discourage new industrial customers from coming on to these publicly served utilities system because there was a shortage of power. And there was also another concern going on here is that Bonneville has traditionally, historically, had much cheaper rates than the investor-owned utilities. And so, like Portland General Electric or Pacific Core. And so, there was also an intent here to try to make sure that an industrial customer who was being served by, say, Portland General Electric doesn't switch over to a publicly owned utility and be able to get the cheap Bonneville power. And so, this is a very specific and precise legislative scheme. So, the 10 megawatt increase relates to the demand of the new customer or of the utility to which it's attaching itself? It relates to the demand of the new customer. But it doesn't say that, does it? It says it very clearly in all of the 27 years' worth of materials that Bonneville has put out that interprets this section. It says it in their previous records of decision on DSI issues. It says it in their previous records of decisions on new large single load. Those are all in our supplemental excerpts of records. We read statutes. And the statute says, which will result in an increase in power requirements of such customer. The customer being the utility, not the industrial user, right? That's correct, Your Honor. Okay. So, your answer can't be right. It can't be that it's the amount that the industrial user is using. It has to relate to the power requirements of the utility. It relates to both. If you look at the language, the power requirements refers to the Bonneville customer, and that would be Clallam. But if you go down to subsection B, which has the 10 megawatts, that refers to the load of the industrial customer. So, I have just under a minute left. I would like to save that and rebuttal if that would be all right. Yeah, that's fine. Thank you. Good morning, Your Honors. My name is Eric Johnson. I'm counsel for the Pacific Northwest Generating Cooperative, and it's 15 members. And we refer to ourselves as the PNGC Group, or PNGC. We filed three petitions that are consolidated here. I'm sure you're familiar with them. We're challenging a decision of the Bonneville Power Administration and three contracts, the aluminum company contracts, that implement that decision. The court has jurisdiction of this matter, beyond dispute, I think, of the parties with respect to the contracts. We contend that the court also has jurisdiction to review the decision document itself. And I refer you to the decision of the panel in the General Electric case decided on May 3. In that case, the court was addressing the lawfulness of both contracts and a record of decision issued by the agency. Can I ask you, what your biggest concern is that you're now going to get charged for these what we call service benefits, the $59 million that's going to go to the aluminum company, because that's going to be an expense of the DPA, right? Yes, Your Honor. So isn't it still a question, though, before the FDRC as to whether those are going to get allocated as costs in peer rate, or is that a done deal? In other words, is this right for adjudication? Yes, Your Honor, it is. Bonneville made a decision in the decision document to allocate costs to certain customers. That decision was deemed by the agency to be final. The decision documents said it was final. The agency refused to allow litigation of that issue in its rate case, which was to make the rates under which these charges are made. So we believe, Your Honor, that we should be allowed to challenge a decision like this. But nothing can happen in the rate case that could result in you not having, your entities not having to pay the $59 million? No, Your Honor, that's correct. It's entirely outside the rate case. The agency made its decision and excluded it from the rate case. Well, I mean, just to make things simple, say they want to charge you $10 a kilowatt, I'm just going to use a number here to make sense, and the rate litigation says, no, no, what's really is appropriate is $9 a kilowatt. Out of that $9, or the $10, whichever it ended up being, is still going to be your share or your piece of the $59 million? Yes, it is, Your Honor. They, nothing has changed since they made this decision. That's material to the court's ruling. They made that decision. They eventually conducted a rate case. We settled the rate case. The issue was attempted to be preserved in it, but the agency excluded the issue from the case and instructed the administrative law judge to strike testimony and argument relating to it. The Golden Northwest case discusses the Blatchley Lane case, which was Memphis, though, and says that in Blatchley Lane, I'm being careful because Blatchley Lane was supposedly not, is not citable, but recognizes that in Blatchley Lane, in what seems to be exactly the same circumstances, we had regarded the cost allocation issue as not right. Your Honor, the cost allocation issue is different in this case. This case involves a challenge to the contracts under which, this case before you today involves a challenge to the contracts under which Bonneville has implemented this decision. In Blatchley Lane, we attempted to litigate the contracts. The court said they were, your claim is barred by the statute of limitations to the extent it's a contract claim, and sent us through the FERC process before we consider our rate arguments. We subsequently filed the Golden Northwest case. The Golden Northwest case considered the rate matters. In that case, the panel would not allow us to argue the lawfulness of the costs, of the inclusion of the costs in our rates. I thought what they didn't allow you to argue, and what you could argue today, and did to some degree argue, is whether there could be a sale at all to the industrial users. Yes, Your Honor. And, but not the cost allocation. It's a fine point. In Blatchley Lane, we could not litigate the contract. We were unable to obtain contract relief in Golden Northwest, or in Blatchley. Golden Northwest didn't hold precluded, as raised here to Cona, did hold precluded the question of whether you could, they could sell it, and that's why that issue was still open. And, and you do have a point. You're also arguing, as one of your principal arguments, that essentially they just can't sell to Alcala, as I understand. They cannot sell to direct service industrial customers when they have no surplus in existence. And, that issue seems to me is not subject to this problem, but the, of who's going to pay the cost allocation if they do do it, they will be subject to this problem. Your Honor, I believe it is not. The reason is, in, in the Blatchley, excuse me, Golden Northwest case, we were not permitted to challenge the lawfulness of the allocation of these costs because we were unable to challenge the lawfulness of the contracts. We tried that in Blatchley. They did allow you to, to challenge the, the lawfulness of the allocation of the costs. That's exactly what they decided, no? In Golden Northwest. It, it's a finer point, Your Honor. All right, what is the fine point? The finer point is the lawfulness of including costs in a rate that were incurred under a contract that was unlawful. In order to prove that the costs were unlawfully included in our rates, we had to argue that the contract itself was unlawful. That was the problem we encountered when we could not comply with the statute of limitations in Blatchley Lane. The court took as a given that the DSI contracts there were valid. Under those circumstances, the agency, according to the Blatchley Lane court, had authority because it had an existing valid, that is, legally immune from challenge, contract. And it had to perform that contract. Okay. And I understand that you can challenge that, as I said before. You can challenge the question of whether they had the authority to enter into contracts with the, the industrial users to, for the sale. And, and presumably also, I should say, and you also argued this to some degree, whether they could do it via the so-called monetization. That seems to me to be legitimate at this point. But how those costs are ultimately allocated maybe isn't. Your Honor, they, they made a decision, published in Iran, that made an allocation decision. Don't you want to argue what I said you could argue? Instead of arguing about whether you can argue what you can't. I'm sorry, Your Honor, I'm, we've been working on these issues for six years. I only have ten minutes, and I'm, you're. Can I get the factual, you said if they had, they could deal perhaps under a surplus. Is it, is the record clear that there is no surplus available at the current time? Your Honor, we believe the record is clear that they had no surplus. The administrative record said repeatedly that the agency did not expect to have a surplus, and it did not want to go into the market and risk the volatility and. So your position is that there, the record is, is that there was not surplus. There was no surplus, except, DPA says, we can go buy more. No, that, that's not an existing surplus. No, sir, it is not. So then my next question is, with regard, let's suppose we agreed with you that they can't monetize, substitute these monetary payments for physical, I'm not saying we will, I'm just trying to understand where this goes. Is there any proviso for whether those costs that have been, because they have been allocated and implemented already, are they recoverable costs to BPA, do they go back to. Our argument is, Your Honor, that the contracts are void ab initio. They were unauthorized because the agency had no surplus. Unauthorized contracts cannot form a basis for the acquisition of power. The contracts being void ab initio, it is our view that the agency has an obligation to the rate payers that pay its costs, our clients and other preference customers, to go get that money back. It's not enough for them to say, gosh, we've got to recover all our costs. Section 7G is the catch-all provision of the rate directives that tells the agency to recover all its costs. Well, is that something that's before us now? If we, following up on what Judge Fisher said, if we were to say that they couldn't do these service benefits of $59 million, then do we have to reach the allocation of costs to your client, even if we decide that it's right? If you find that the contracts are invalid, you do not have to reach that issue. And that's something that would go back before the BPA. They decide what to do about your rate. It's our view, Your Honor, that the only possible conclusion is that the allocation of costs under unlawful contracts cannot stand, and the agency must recover those costs from those to whom it paid. But that's not before us now. We wouldn't have to say that. It's the remedy I'm asking you for. You can, I can win without you reaching that question. All right. What about on the surplus issue? There's a fuzziness about whether, and Golden Northwest highlights this, about whether the surplus is over what they've already got or over what the FBS total would be if they actually replaced everything that they could replace as part of the FBS resources. And I'm not sure which one you're arguing when you say that it's not surplus. Our argument is that the agency must have, in its inventory, surplus that preexists its decision to enter a contract with the industrial customers, the direct service industrial customers. Without that surplus, the agency has no authority under Section 5F or under Section 5D of the Northwest Power Act. You can reach that conclusion by looking at the very language of Section 5F. It says that is surplus, not that will be surplus after they go out and buy it. But that's not what Golden Northwest decided, that they could do that? No, Your Honor. In Golden Northwest, you must remember, the court was presented with, it was a rate dispute. But a predicate to this dispute was that there were contracts in place that could not be challenged as unlawful. That's because we lost the black and blue. Your contention is that if that surplus under F means more than what they've got, not more than what they could get if they replaced FBS resources. That's correct, Your Honor. Since 1992, when the energy market was deregulated, there's a robust market. Bonneville can always go buy more. And that's not what Congress intended. Thank you. Thank you. I'm Mike Dotton with Heller, Ehrman, White, McAuliffe. And I represent the Petitioner, Alcoa, in this case. And I had prepared an argument, but based on the court's questions, I think I'd rather just immediately address some of the questions that the court had. And of course, the court has asked whether there is any surplus. We think the Golden Northwest case decided by this court says that Bonneville has both the right and we believe the obligation to fill up the federal-based system to the level that it was when the act was passed. Well, the problem is the statute is so spread out in different places. And there is somewhere else a definition of surplus energy. But surplus power under 839CF of the 1980 Act talks about surplus to its obligations incurred pursuant to subsections B, C, and D. And it doesn't seem to have a reference to the FBS power sources as opposed to obligations. Filling up the FBS would not be the creation of surplus, Your Honor. Those would be firm resources. And we believe that that is an obligation that Bonneville has in order to provide electric power service to the BSIs. And we think that Bonneville originally probably interpreted the statute that way itself. We cite in our brief the letter from the administrator that was sent out with the contracts. So you're just tying back to your notion that there's a perpetual obligation. So that's how you would get there because you'd go through D and you'd say, under D there is a perpetual obligation and therefore it's part of the obligation. That's correct, Your Honor, at least with respect to the federal-based system. Then separate and apart from that question, there's the Regional Preference Act, the Northwest Power Act, and the Excess Federal Power Act, each of which really results in the same conclusion, which is during periods of time when Bonneville has what would otherwise be surplus power, it must first offer that power within the region to its customers before making sale outside the region. And that's very clear from the legislative history that we recite in the, relating to the Regional Preference Act. And it's very clear that that provision was intended to, in order to the benefit of industrial customers as well in the Pacific Northwest because the concern that Congress had when it authorized the intertitle was that the power would be sold outside the region and that benefit lost to the region, including for industrial consumers. So. But in this instance, what is there in the existing documents that you're challenging that suggest that the agency is selling power outside the region instead of selling it to you? Well, Your Honor, they talk consistently about sales of surplus power and they consistently also talk in the record about opportunity cost. The only way there would be an opportunity cost is if Bonneville would otherwise lose a sale it could make somewhere else. Having satisfied. Somewhere else as opposed to in the region, but not, but a surplus power. The lost opportunity cost was if it provided power as opposed to monetary benefit to the DSIs then Bonneville would lose the sale of that power. Whether we, in order to, whether it's traditional surplus in the sense that it's in excess of the requirements of meeting firm loads or whether it's surplus power because there's lots of power made available because there's a lot of snow in the mountains, a lot of water through the dams. It really doesn't matter. In order to make. I still don't see how we can look at these, the rod and the surplus rod and all that and include that the power has gone out of the region. I understand that it may be surplus, but how do we know it's going out of the region? I, I, it just doesn't seem to be right at this point. Your Honor, for, for five years I was in the general counsel's office at Bonneville. I kept very close tabs of those. I may be, but we have to be able to review something. What's the something? Your Honor, I, I think you could ask Bonneville whether or not during the period of time this contract has been in place it's made any sales outside the Pacific Northwest and, and I, I would invite you to do that. I assume you could challenge a sale outside the Pacific Northwest. Have you done that? Has there, if there's been one? The, the problem for us and for the court as well, Your Honor, is that these sales take place hourly, daily, weekly, for the long term. So what presumably we would have to do to preserve our right as to the claim to each of those would be to file a claim each time such a sale. Suppose we reject your conclusion that, that your perpetual obligation conclusion, which I understand is separate from what we've been discussing. Then where's your, then what are you complaining about and what is your argument? If, if you reject the, the, the Section 5B rights to power. Right. What, what we're claiming, Your Honor, is that every customer in the Pacific Northwest, including the DSIs, have the right for, to have Bonneville first offer to make a sale. So then you, you go to the regional problem, but there's nothing in between. Basically, if you, if you can't win on, on the perpetual obligation, then you have to go to the regional, to the regional problem. Well, we think that in the Golden Northwest case, Your Honor, that, that the court did also suggest that Bonneville has the obligation to fill up the federal-based system. So that, that's a, a, a, a lesser amount of power, but an amount of power which the court concluded the DS, could be offered to the DSIs and rolled into the rates of all of the customers, including the preference customers. We think that's the holding in, in Golden Northwest. And although the court didn't address it with respect to post-2001 contracts, in fact, it was dealing with post-2001 contracts. Here's a practical question. You, you keep saying that you're entitled to cost-based power, right, as opposed to the surplus power, which I guess is not cost-based in that, right? No, for, for many, many years, Bonneville did sell all of its surplus power at a, at the cost of providing that, that power. So one can determine the cost of surplus power. Right. But the, there is a provision in, in 5, well, not in 5D, but I guess in 839D about the, the rate of, the, the, the rate for the industrial customers, which I guess is the industrial rate, right, which are cost-based with an, an, an add-on for, for the retail margins. Yes, Your Honor. Section 7C. Section which, I'm sorry? 7C. 7C. Of the Northwest Power Act. Is that the rate that you say that you should be getting? Yes, Your Honor. That is the same rate that Bonneville offered to Fort Townsend, also a DSI under the Northwest Power Act. There's a, there's a, a defined term, direct service industry in the Pacific Northwest Electric Power Planning and Conservation Act. Bonneville has always historically treated its direct service industrial customers as a class. And the only rate that would be applicable to that class for the period after July 1st, 1985 is found in Section 7C of the Act, which you correctly said was effectively the preference customer, as Bonneville defines it, or the statute defines it, the preference customer rate plus a reasonable margin. And that is the rate that has been offered to Fort Townsend. Now. But not offered. But that is not the rate that was quote monetized. What rate is that? Where did that rate come from? The rate that was quote monetized. What rate is that? We think it's a fiction. We described how it's calculated in our brief, your honor. But basically, Bonneville concluded that it could afford, or its other customers could afford approximately $59 million. And then Bonneville backed into an amount of power of 560 megawatts, making the assumption that Bonneville would be reducing the customer's rate by about 12 mils per kilowatt hour. Which is not the IP rate. It's less than the IP rate, right? No. It turns out it's substantially more, because the aluminum DSIs have to buy power outside the region, mitigated only by that $59 million, which Bonneville calculated as 12 mils per kilowatt hour. But the net rate is substantially higher than that, according to the only thing that's in the record comes from Alcoa, and the estimate is 34.5 mils per kilowatt hour. Substantially more than the rate that Fort Townsend is paying. And I'm hoping, if I can, your honor, to preserve at least, well, I guess now just a minute of time. I couldn't save it. That's okay. You want to save it for rebuttal? Yes, if I may, your honor. Go ahead.  Good morning, may it please the court. My name is Courtney Olive, and I'm representing Respondent Bonneville Power Administration. I, too, had a planned argument to begin with, but I'll start with some of the court's questions and hopefully bring a little clarity to things. I'd like to first address PNGC and Alcoa's portion, and then I'll turn finally to IC&U. It would be helpful to me to begin with the following assumptions. Sure. That you're right about both ends of whether you can sell to Alcoa, i.e. that you don't have to, and that you can, right? Start with that, and then say whatever else you want to say. Sure. The way the parties have framed it is whether or not BPA has authority to make these sales. As you just mentioned, we're authorized, but not mandated. So the next question is the one that you were... But you're authorized, and this is one thing that's of concern to me. That depends on Section 5D, right? That's where your authority's coming from. That's where our initial authority came from. That's where your authority's coming from now. Correct. Our authority now comes from 5F, which applies to surplus sales for all our customers, including direct service industry customers. So you're not relying on 5D as the source of your authority. That's right. We're now relying on 5F because this is a sale of surplus power. It's a special kind of power. Okay. Now, let's zero in on that. Sure. I don't understand yet the concept of surplus here. Council suggests that you start out with a federal base rate, and therefore you can acquire power to create, to fill it up. So even though you're going out to get it, you don't have it. You have to buy it to create a so-called surplus. If I'm misstating the argument, then correct me, but I'd sure like to understand how surplus works in here, if you have to go out and buy power to create a surplus. Right. I'll see if I can explain that. What Bonneville does is it projects a certain amount of surplus in the future. You never know how much water is going to come down the river. So you can make a fairly educated guess as to how much surplus you'll have to support a five-year contract, but in year four, you may hit on a drought. And if that's the case, Bonneville may have to go out in the market and make a few purchases to support what it agreed to earlier when it entered into the contract, to support that sale. So the very nature of making surplus sales is one of projecting how much surplus you plan to have available. But inevitably, and you knew, do you start out with a, do you have to start out with a surplus if you then? No, no. What PNGC is talking about, that we have to have some sort of inventory of surplus or off the shelf, that's simply not how it works at all. But how can the authority to sell surplus create the, does it become circular? It has to be surplus to your obligations. Right. And then how does it become an authority to sell, to meet a contract just because you entered into the contract? It can't be that because you have agreed to, in this case, not sell, but suppose you had sold to Alcoa, therefore, you can go out and buy surplus to meet your obligation to Alcoa. If you're looking for authority to enter into sales agreements in AFT, then surplus has to have some other content other than we've agreed to do it. Well, it may seem a little counterintuitive, but it comes directly from Section 5F and the definition of surplus, which says, the administrator is authorized to sell or otherwise dispose of electric power, including power acquired pursuant to this and other acts. So that's where you get the ability to acquire power to fill in gaps in what you projected. That is surplus to his obligations incurred pursuant to subsections B, C, and D of this section. So surplus can include power that you actually go out and acquire. When Congress wrote this, I believe they recognized that the hydro-based system isn't necessarily one that requires projections of how much power you have available. And this- But then it has, I mean, it has no measure with regard to obligations in the sense, and this may not be a criticism of it, but you have to therefore mean that they could just go out and buy whatever they want and sell it to whomever they want. I mean, because that's essentially, if you read it that broadly, that's what it says. We don't take it to that degree, no. It's, Bonneville has to have a forecast of actual surplus power. It can't just make up a number. But the surplus has to be based on what they expect to sell to whomever they want to sell it to. So it still amounts to the same thing, except that it's just an advance instead of moment to moment. That's exactly the distinction. It is an advance. But they could say, we want to sell some power to New York, and we're going to go buy it from, you know, Columbia, South America, and, you know, and get it up here. And that's going to be surplus, and we're going to spread that out among everybody. Right. Now, the limitations on that would be the capacity of the federal-based system. Now, where is that in here? That's what I'm trying to find out. If this is the source of your authority, I don't know where the federal-based system limitation is. Well, it's kind of strange, because it comes from a number of statutes. Surplus energy itself is defined in another act. Right. I understand that. That's different. But I understand you're not running on that, because that really deals with selling outside the area, right? Right. Okay. So you're not basing it on that. You're basing it on this. Correct. And this, if you're reading it as broadly as you're saying, then that doesn't seem to have any limit. No, it does have a limit, and that limit is based on what the system can actually produce. Where? Where is that? I guess it's not coming directly to me right now. We don't feel so bad now. We're having trouble finding it. I thought about starting the argument with, welcome to our world. Can I go back a minute, just to amplify a bit? You start out by saying 5G is your overarching authority, right? Yes, and it was specific to an initial set of contracts. We're not relying on that any longer. All right. So you mentioned then going over to F, and F, you mentioned, refers to subsection D. Now, was that just a stray remark, or are you? No. No, it's not at all. I'm trying to figure out the connection between F and D. Sure. D is referenced in F, and what F is saying is that surplus is in excess of what other contractual obligations Bonneville already has, under B, C, and D. Right. Now, since D is a type of sale where we are authorized but not mandated, that obligation could be zero, and that's what has happened in this case. Bonneville. But this is what I don't understand. It would be a plausible reading of D. I mean, you do seem to equivocate on whether or not your authority to sell to the DSIs comes out of D. And I thought you were trying to just say to me, no, it doesn't. It comes out of F. And the only way you could get to that, it seems to me, is by essentially saying that all of D only applies to the 1980 20-year agreement and nothing else. That's, D does apply to the initial contracts. I'm sorry, and only the initial contracts. Bonneville could enter into other contracts under D if it wanted to, but it's not mandated. That's what the legislative history says about it. So, if you will, you almost have to think of F as just dealing with this surplus power and acknowledging that we have surplus power available. The issue that PNGC has sort of morphed this into is whether or not we have surplus power. You see, I find that very, I mean, if D doesn't wash entirely after 2001 or whatever it is, if it's just not out the picture, then I don't know why when you talk about obligations incurred pursuant to D, you're not talking about whatever obligations you incur with regard to the DSIs. How do you get to choose whether you're, if you're authorized to enter into, to sell electric power to existing DSI industrial customers, and this is the authority, then anything you sell to the DSIs has to be under D, no? No, that's not correct. F has no limitation of the type of customer we can sell to. But it does say it has to be in excess of obligations under D. That's right. So, if this is an obligation under D because it's D that gives you the authority, then it's an obligation under D. So, I guess we're getting crossed up again. The type of power is crucial here. So, this is surplus power under 5F. Because you say it is. It's only because you're. I didn't finish it. I'd like to hear an answer to that question. Okay. And the reason that it has become surplus power with regard to 5D is because under 5D Bonneville is only authorized, not mandated. So, Bonneville could choose to make zero sales under 5D and make that obligation zero. And that's what we've done here. So, anything. But you're saying basically in your base position is we don't have to sell it to them at all. Correct. Okay. So, there are no obligations that are setting a base as far as DSIs are concerned. Right? That's right. Okay. So, anything that we are going to sell to DSIs would come out of surplus. That's right. Okay. Now, I'm still confused as to surplus to what? Since it's not coming under its dispose of language of F. Right. It's surplus to the B, C, and D obligations. So, B is extremely important, too. We have lots and lots. You're saying that you're serving other customers under B, C, and D. Right. Under B, C, and D, we have a tremendous number of contracts. It just so happens that now we no longer have contracts under D. So, that one is now zero. But there's still hundreds of contracts under B and C. And you have power in excess of what those? Correct. Contracts. Exactly. But you do have to have, at the time you enter into the contracts under F, you do have to have that projected surplus. Exactly. Exactly. Which we do. And I'll point the court directly to that. In the sub-note I, we noted that our projections of surplus could be found in a rate case document, and that rate case document is an SER-298. We project over 1,900 megawatts of surplus. That's ample to serve the 560 in these contracts. Right. What was the site? It's SER-298, and the supplemental rod sites to that document, but that's the specific document. The supplemental rod sites to it at SER-196. PNGC is really raising a red herring here about surplus. They do not contest the numbers in this document. They haven't proposed an alternate document, and they haven't said that, well, Bonneville's not able to meet its obligations to us. We haven't gotten the sales that we're statutorily entitled to. Why, in 839 EC, it says rates applicable to direct service industrial customers, and it states for the beginning, under B, for the period beginning July 1st, 1995, at a level which the administrator determines to be equitable in relation to the retail rates charged to the public body, et cetera. Is that the rate that you use? We're going to get, and I hope we're going to get to the question of whether you can do this monetization at all. Right. But is the rate that you use for that, that rate, that B rate? No, it's not that one. That. Why not? Because that would apply if we were making a 5B sale. Why? It doesn't say that. It says the rate or rates applicable to direct service industrial customers. It doesn't say under X section or Y section or anything else. It just says the rates applicable to direct service industrial customers. Well, I'll certainly concede the act is not a model of clarity, so. No, it's really clear. It's quite clear. Well, if you're making a sale to DSIs under D, but this is a surplus sale. I mean, it's. But it doesn't. Okay. Not a DSI sale. It's a sale to a customer who is a DSI. It happens to be a DSI. Got it. Yes. Whether that's right or wrong. So. Interpretation. That's what you're saying. That's the agency's interpretation. So, the rate that applies to surplus sales is not this cost-based rate. It's the rate that Bonneville establishes for it. A useful distinction might be the Kaiser case that this court decided in 2001. There, the court talks about a cost-based rate and the industrial power rate that would apply to that cost-based sale versus a surplus sale to the DSIs and the surplus rate. In that instance, Bonneville was doing both at different times. So, selling surplus is not something new. Selling to the DSIs is not something new at all. We get to the issue about, instead of providing electricity, you can provide money. You bet. What's your, I mean, I understand what you're saying, that you have discretion to provide to the DSIs after the initial contract. And where is this idea that you don't have to give them electricity? You have to give them electricity. Sure. So, just so the court understands, the service benefits are to represent the value of the contract. Right. I understand that. But if it's sort of, I hate to use like a switch, but it's either you give them electricity or you don't, I don't understand why it isn't, give them electricity or you don't give them electricity. You have, give them electricity, don't give them electricity, or something in between. Give them the value that they would have had by getting electricity from us and have them purchase the house. Right. Which you're doing, right? Correct. Correct. The reason for doing that was to respond to the public comments that we had that throughout the comments said, if you're going to do this, Bonneville, you have to do it at a known and capped cost. Now, if Bonneville was going to sell this surplus to the DSIs, as I mentioned earlier, inevitably our projections of surplus could be off. So, it's almost a certainty that we would have to go into the market from time to time and make some purchases to fill in the gaps in that surplus. That exposes us to the risk of market price. We don't know what the market's going to be like two years, four years, five years into the contract. So, it's impossible for us to meet the goal that all our constituents said, which was do this at a known and capped cost. If we're providing power that we may be filling in gaps with that power and making market purchases, we can't do it at a known and capped cost. So, the way to do that was to monetize the value of the contract so that we would know up front in advance how much the DSIs, the maximum amount they could potentially receive. They could receive less, and if they're operating their smelter lines at a lower amount and using less power, they do receive less service benefits from us. But that's a perfectly rational explanation, but where is your authority to do it in the statute? The authority comes from Bonneville's broad authority to contract, as this court discussed in APAC. It's based on the Bonneville Project Act, Section 2F, as well as the Northwest Power Act, Section 9A. So, we tie that authority to structure the contract and write the terms and conditions in a way that makes sound business sense with Section 5F, the authority to do a surplus sale. So, 5F. Why isn't the Supreme Court, I think it's another Alcala case, which basically says, you know, your right to contract doesn't give you a right to just do whatever you feel like it. No, absolutely not. Bonneville's right to contract has to be grounded in a substantive right that it has in the statute. Here, we're grounded in 5F. That's our authority to make surplus sales to all customers, including... You're not making surplus sales. You're not selling any electricity. Well, actually, the contracts are surplus power sales contracts. They were executed with specific megawatt amounts of power. True. They do have a provision that after they were executed, the DSIs chose to exercise, which said, we're going to set the amount of service benefits, and we're going to make this a paper transaction instead of an actual power sale. So, that was voluntary with the DSIs? They could have insisted on the power? Well, it actually, the DSIs chose to exercise the option for the last two years of the contract, Bonneville had the decision to do it for the first three years. It wasn't a choice? I'm sorry? So, it wasn't a choice? It wasn't. Was that a choice? Oh, it was a choice with regard to the last two years, but for the first three years, you went in knowing it was going to be money. That's correct. That's correct. What's the contract? I mean, I understand you're saying it's the power of contract, but what's the contract? The contract is with the DSI. Yes, it's between Bonneville and the DSI. Let me also mention that this is common utility practice. I'd like to point the court to SDR 193, I believe it is, where we discuss how Bonneville has done this with the DSIs in the past, something called the load reduction agreements in the energy crisis where they had contracts with us. We executed amendments to those contracts to buy back their power. So, we effectively paid them for the value of power. But what's the contract here? Because you're not providing them with electricity. The contracts here are entitled surplus power sales contracts. They have complex formulas in them that reduce what the value of the power would have been to a monetary amount. What's the consideration provided by the DSI? The consideration that's provided by the DSIs is being a business partner for Bonneville and having supported various efforts that Bonneville has made over the years, such as the load reduction agreements that I spoke of. But what, I mean, is there, I think DPA wanted to get out of this and they said, well, there's no consideration. That's past consideration. What are the DSIs going to do? What detriment are they going to incur? What rights are they going to waive by these contracts? Well, they don't have rights to require us to serve them. So, they're not waiving those. According to you, right? Right. I think that's a question I would need to submit some supplemental briefing on. How do I frame this in a contract? In a contract, so I'm saying, okay, are you contracting? Contracting means you're giving, you're certainly giving consideration. And what are the DSIs giving? Well, if the DSIs are giving, well, we'll just, you know, we won't take electricity from you. We'll get it from elsewhere. But if they have no right to take electricity from you, there's no contract. There's consideration by DPA, but there's nothing by the DSIs. It's not a contract. And it's really just kind of government subsidy. DPA is subsidy. Well, whether or not it's a subsidy is sort of beside the issue. I mean, it's whether or not Bonneville has the authority to provide a contract. If it turns out that it benefits the DSIs and it's a below market price, then that's just the nature of Bonneville. We're a cost-based federal agency. We don't. What does DPA get from the DSIs? Without calling it a subsidy. We get the continued business relationship. That's what you're looking for, is a business relationship. Yeah. And one thing to keep in mind is part of Bonneville's obligation is to serve power at the widest possible diversified use. Bonneville only has three customer groups, the DSIs, public-owned utilities and cooperatives, and investor-owned utilities. So if you're not serving the DSIs, that really knocks down how. But you're not serving the DSIs. You're giving them money. So how is that a business relationship? That's a strange business relationship. Well. Charity. Yeah. I'll grant you that. I mean, it's, you know, this is not. Can I follow up on something that you and Judge Fisher were saying? Are they obligated to purchase through the other public utilities that you service? You're talking about it's the business relationship. What's that business relationship? They're not. No. They can purchase directly from us. That's where their name comes from, direct service. Right. But what I'm trying to, you say that the consideration is it's a business relationship. We get a business relationship advance, DPA, right? Correct. And it's in recognition of their past practices of being. I wouldn't be. That, you already got that. So what are you getting in the future? What value is DPA getting by doing this? Well, to continue to potentially have contracts that aren't monetized and may actually provide power, physical power. What do you mean by that? To ensure that the DSIs are operable and continue to exist. If they fall out as a customer, it's not Bonneville's responsibility to ensure that they exist. But if they are no longer a customer group in the future and we can't make physical power sales, then we're not meeting the diversified goal. Another question is about the fact that these contracts don't have any reserves in them. And that the, I guess your answer is going to be again that this isn't an AP contract. Exactly. But your longer answer was we've done it this way for a long time and it's not practical. And you certainly have a lot of practical problems, but the overall sense that you're manipulating around the statute to deal with those practical problems seems to come through pretty well. And particularly as to that issue, too, it appears that Congress did intend in your dealing with the industrial companies that their power rights be contingent on some limited kind of reserve rights, and this one isn't. Well, we have kept that option open. And we discussed that in our brief through a mechanism called the Supplemental Contingency Reserves Adjustment. We haven't just written off the idea that the DSIs have to provide reserves. But the threshold question is exactly as your Honor put it, that only comes into play if this were a 5D sale. It is not. It's a surplus power sale to a customer and that customer happens to be a DSI. So it's not required that they provide reserves. I see I'm over time and I haven't touched on the ICMU issue, perhaps. Which issue, I'm sorry? I have not touched on ICMU's issue. I think we have that one in mind. Okay. Are you splitting your time with somebody else? I'm splitting my time with Intervenor Port Townsend. They have seven minutes. But they can address that. Could I just, one last thing. There's no obligation on any of these DSIs to stay in business, correct? Not through the statutes, no. Well, or through any contracts with BPA. No, no, absolutely not. In fact, one of the contracts that was executed, it's my understanding, the Golden Northwest, that DSI, well, they're not operating. I don't know if they're in business or not. Isn't this just kind of welfare for them, that you hope that you give them the subsidy that they have to buy electricity someplace and you hope they stay in business because then they'll buy electricity from you and they'll use it? You can attach whatever label you want. The question is whether or not we have authority. And 5F gives us the authority to do it. Only if it's a contract. Correct. And if the court examines these contracts, I suppose, and. There's no consideration by the DSIs, therefore there's no contract. And. I think, well, but I think the consideration is the business partner relationship and supporting Bonneville's. But more simply, only if it's a contract which sells or otherwise disposes of electrical power, and at least for three years it doesn't. Why don't they have 5F help you? Well, again, SCR 193 talks about how monetizing a contract, even though you reduce it to a paper transaction, it can still be considered a surplus power sale. So it's a common utility practice and Bonneville has done it in the past. If you were optional, I can sort of see what you're saying. You know, they can buy the power or they can choose not to and get money. But it's not optional. You are refusing to sell them power. So how could it come under 5F? Just by virtue of the fact that the service benefits represent the power. And that within the utility industry, sometimes it's not practical to provide physical power. And again, that site from the record explains that. I would like to ask one question about the Port Townsend. I have a similar problem with Port Townsend, which is that there is a definition in the statute of what a new load is, and you're going to tell me again that this isn't under that. It's under 5F, but there's no exception. It's not a matter of whether there's an exception. It's a threshold definitional question. If you're selling surplus power, which as this court's jurisprudence discusses in Kaiser, in various cases related to the DSI, is a special separate type of power. You are not in the world of new large single loads. You simply don't apply those provisions. But that does depend on the power requirements notion, right? Correct. And it requires equating the notion of power requirements with firm loads. That's right. But it's not the same language. It's not defined. Where are you getting that from? It comes from the fact that power requirements dovetails with Section 5B, okay? So Clallam is a customer who has a right, a statutory right under 5B to categorize part of its power as its quote unquote power requirements. It's not just a common Webster's Dictionary term. That's an industry term as well. But it's not in 5B, that term, is it? I recognize that, Your Honor. But 5B is the mechanism which Bonneville uses to serve a customer's power requirements. It's because 5B says whenever requested, Bonneville must meet the firm power load of Clallam Public Utility. But the new power load statute isn't talking about the power requirements of the customer, it's talking about the power requirements of the utility. That's right. It's talking about Clallam Utility. So Clallam turns to Bonneville and says, we consider this new Fort Townsend load to be part of our power requirements, so under 5B we are requesting you to serve it. We have to serve it. That's not what they've done. They've turned to us and said, if you have some surplus power available, we'd like to buy it and we will use it to serve Fort Townsend. They don't have to make us serve surplus power to them. That's the distinction here. If it were a 5B sale, it's possible this could be a new large single load because Clallam has the right to force us to sell to them under 5B. That's not what we're dealing with. This is 5F. You're saying they have no right to force you to sell power to them to support Fort Townsend? Correct. And that's why they don't have that contractual obligation? Their only rights are determined by the contract. If it were a requirements power sale, they would have a statutory right to force us to sell power to them. They don't have that. All they have is because of the contract. I understand all that, but where are you getting the notion that the new direct service industrial customer language depends on it being a 5B contract? Because of those words in 313, the NLSL definition that say power requirements. And power requirements is a label that customers attach to contracts that they want to force us to meet under 5B. They say this bundle, this is part, there's a huge process that they formally go through and say this is part of our power requirements. We're going to consider this to be something you have to meet under 5B. They haven't done that here. They've said this is a surplus sale. We recognize that. If you have it, we'd like to buy it. If you didn't go through these gymnastics and have surplus power, basically, Claylam can say look, we can't service Fort Townsend. You have to get power from someplace else. That's between Claylam and Fort Townsend, what they would say. So. Well, but Claylam can't say you've got to give us this power because we have an obligation with Fort Townsend. They could say that if they placed it under 5B, but they chose not to. That's what I'm saying. So. Well, then, yes, you're right. Okay. Thank you very much. All right. Good morning. May it please the court. My name is Leonard Feldman and I'm counsel today for Fort Townsend Paper Company. As we explain in our brief, Fort Townsend's interest in this case is limited to the NLSL issue that of course was addressed by Ignew first and then Bonneville second. And if I could just very briefly follow up on some of the comments of Mr. Olive with regard to the statute and then turn to what this means for Fort Townsend as well as some of the comments that Ignew submitted in the administrative record. Those are the issues that I'd like to cover. There's been a lot of issues this morning that I think are exceptional and confusing. This one I don't think is one of them. The statute definition of new large single load clearly makes a reference to power requirements. In the context of the statute, because that's the world we're living in, not the common sense interpretation that Ignew's counsel proposed and not Webster's dictionary, but in the context of this statute, there is a way for a company like Clallam to express and declare its power requirements. And Judge Berzun, you were asking this question earlier. How do we know what the requirements are and what aren't the requirements? If one party goes down by 10 and another party goes up by 10, the way we know that is that Clallam declares it. And they declare it under section 5B of the Northwest Power Act and then Bonneville has a statutory obligation, a requirement that it serve that power. And that's not what happened here. So under section 313 of the Northwest Power Act, we do not have a new large single load. That of course is entirely consistent with the legislative history as well where Congress expressed a concern that parties would move their load from Bonneville as a DSI to a preference customer or IOU on the other. And that Bonneville would still be obligated, obligated, that's Congress' word, obligated to serve that load while at the same time the DSI is now getting the more preferential preference rate. Bonneville has interpreted the statute so that's not an issue. If it's firm power and Bonneville's required to serve it, it may give rise to an MLSL issue. But if it's surplus power and Bonneville's not required to serve it, then it doesn't. How are rates set under 5F which has now become this little statutory monster taking everything over, the rate that is actually being charged to Port Townsend as I understand it is pretty much the industrial rate, is that right? Well it's the preference rate plus the industrial margin. Plus the margin. So that is what's defined in the statute as the industrial rate. Bonneville sets its rate under Section 5F according to its cost of providing the surplus power. What I think is important to emphasize here with regard to rates is that the price that Bonneville set the rate at for Port Townsend is the rate that ICNHU advocated in the administrative process. This didn't start as an MLSL issue from ICNHU's perspective. It started as a rate issue. First, at AR 1207, ICNHU submitted a comment that said that Port Townsend shouldn't be able to purchase power at below market rates and that quote, a better result would be to charge Port Townsend the priority firm rate plus a typical utility margin. And then second, at AR 1218, ICNHU added that BPA's decision to offer a preferential rate to Port Townsend quote, is discretionary on the part of BPA and it urged BPA not to offer a rate that may be lower than the rate charged to any ICNHU members. So Bonneville did exactly what ICNHU proposed. Bonneville adjusted the rate so that it was the PF rate which is the rate that is obtained for preference customers plus a utility margin because the utility has cost that it incurs in passing through the power to someone like Port Townsend. So I think it's somewhat disingenuous to claim that Bonneville abused its discretion or acted in excess of its statutory authority when Bonneville set the rate at exactly what ICNHU had proposed and with regard to the NLSL issue, did exactly what they had asked for as well. But the fact that they proposed it doesn't make it statutorily authorized. I'm trying to figure out how it happens that just coincidentally without regard to what the power is actually going to cost when they go out and buy it, this rate turns out to be the industrial rate that would have been charged if they were charged directly. That's essentially what's going on here. Well, the question, it's the new large single load issue. If Port Townsend is a new large single load, then the rate that has been set is not the NR rate. Okay. But if they're not and you're going from 5F, how do we know how rates are set under 5F? There is no challenge in this proceeding to the rate that's being charged to Port Townsend. The challenge is that it's a new large single load. And I apologize if that doesn't make sense. But it's the categorization point that I think that's the issue. I understand that. But it would be helpful in order to evaluate whether this really is a 5F surplus agreement as it's being claimed to be rather than a disguised something else. It would be helpful to know where that rate's coming from. The rate is set in a rate-making process by Bonneville according to its cost. And it has a rate for its preference customers. In this particular case, it has added a utility margin to compensate CLAL and PUD for its cost. Yes. But I guess that exposes my problem. Because if it's not a B sale, then why is it being done at a B rate? It's not a 5B sale because the 5B sales are to CLALM. Right. But CLALM is buying this at a preferential rate. And CLALM is entitled to purchase it at a preference rate because it's a preference customer. The question is what price is Fort Townsend permitted to pay? Is it permitted to pay a rate established by Bonneville under 5F or does it have to pay? In other words, can it pay the rate that Bonneville established here or does it alternatively have to pay the new large single load rate which is I think 2.8 times higher? That doesn't seem right to me. 5F is about selling or disposing of power. It's not about setting rates to ultimate customers. So the 5F sale is to CLALM. It's not to Fort Townsend. And if it's not a 5B sale, then why is it being done at a 5B rate? Well, again, it's not being done at a 5B rate. It's being done at the preference rate plus a utility margin. And that's the rate that Bonneville established under 5F. The surplus power provision deals with the sale to the utility. Is that not right? That's correct. Okay. So in judging whether this is a 5B sale or a sale under 5F, you're contending that although it's a sale to a preferential customer, it is not a 5B sale. That's correct because it's at a different rate. Well, it's because it wasn't declared to be a 5B low. But it's not at a different rate. It is, in fact, at the preferential rate. That's what I'm pointing out. All right. And perhaps I misunderstood your question. Okay. The rate is established under 5F for surplus sales because the power wasn't declared by CLALM to be part of its required firm power under 5B. But you said because it's a preferential customer, it has to be at the preferential rate. And it is at the preferential rate. And I may have misspoke, then, Your Honor. CLALM has the ability to buy power from Bonneville in two different ways. It can declare it to be firm power and it can get the firm preference rate. Or it can ask, as Mr. Olive said, for surplus power that is not being purchased otherwise. And then Bonneville sets that rate. Okay. Good. And Bonneville set that rate here. At the preferential rate. At the CLALM, at the preference rate. As regards to Port Townsend, it got it at the preference rate plus a new payment. But how can it do that? And that's why it does seem to me to matter where this rate is coming from. Because it seems to me to belie the notion that this is really being a surplus power because it's being sold at a non-surplus rate. No? All right. Why don't we do that afterwards? Go ahead. I think we've got your position. Yep. I used up my time. Thank you, Your Honor. Okay. Why don't you answer that question quickly. So, because we need to get back to the other slide. With regard to the rate, it is a rate established under 7F for surplus power sales. It so happens that that is a negotiated rate that Bonneville can negotiate between whichever party it's contracting with. And in this instance, Bonneville negotiated that rate to be equivalent to the PF rate plus some industrial margin. So, it is a surplus rate. But it's just that in this instance, Bonneville exercised its discretion to negotiate it to where it was almost equivalent to the PF. Thank you. All right. The questions that the court just went through with the respondents illustrate how convoluted and difficult the argument is to justify these contracts. And I should add that all of these contracts, the DSI contracts as well as the Port Towns and Paper contracts have the same scheme in terms of the powers provided from Bonneville to their local utility and then to the end customer. In the case of Alcoa, the other DSIs, it is then monetized. But they all suffer from the same new large single load problem. Essentially, to buy into Bonneville's argument, you have to accept two things. One is that Bonneville can get around the plain requirements of the new large single load definition whenever they want to if they just simply say this is surplus. That absolutely cannot be the correct scheme of the statute. That exception absolutely swallows the rule. What Bonneville would like that statute to say is instead of power requirements, firm power requirements, and they try to tie that back to 5B. The statute does not say that. Those are two very different aspects of the statute and they have very different meanings and they do not tie together. Basically, any new industrial customer that's 10 megawatts or larger is a new large single load, whether it's served by surplus power or firm power or non-firm power, it does not matter. It is simply illegal. Thank you. Thank you. I have two objectives on rebuttal, Your Honor. One is to answer Judge Moskowitz's question, where was the consideration of the contract? And I think there are three areas of consideration. One is there's the detriment of the DSIs. In order to get the monetary benefit, they have to continue to purchase power at a much higher market rate from someone else. Second, there is a provision in the contract where ALCOA at least had to give up the right to seek recovery of its power costs in the event that this court ultimately determines that it was entitled to power, not the monetary benefit. And finally, Bonneville has a number of operating benefits by having the DSIs online. Remember that this was a system planned for 3,000 megawatts of DSI load. It's now down to about 1,000. Bonneville is experiencing some voltage stability problems in various portions of its system because those loads have declined so much. So there is some operational advantage to having the DSIs. Give me two more seconds on the first basis. Yes, Your Honor. They have to, the first basis for consideration. Yes. The DSIs are required in order to get the monetary benefit to purchase power from third parties at market rate. Third parties? Meaning utilities wherever they can get it who may be generating the power. Not utilities that are getting it from the BPA? That's correct. So that's that consideration to the BPA? It's consideration to BPA because it requires Alcoa to go out and acquire that power. It's a condition of the sale. I thought, so Alcoa is comfortable with this monetization business and you're just looking for more of it? Is that the bottom line? Alcoa, we are not comfortable with the monetization benefit because we think the, it provides too little. In effect, it provides substantially less power. If you monetize that amount of power, substantially less power than Alcoa requires to operate in the other DSIs. We are defending the concept of paying you instead of giving you power. Yes. In a way, Your Honor, it's in effect a lesser included benefit. Alcoa is entitled to more power. Bonneville has monetized a smaller amount of power. So we defend it, Bonneville's right to provide monetization in lieu of power, but it must provide an adequate amount. The other question that I hope to address, because it was addressed by this court and I think there's a great deal of confusion about what is surplus. In the MSR case, this court was previously asked to address the question of excess federal power under the statute. And here's what the court said. That's different. That's defined differently. It is, no, it's, well, I think if I can read this quotation, Your Honor, I think you'll see that it's not. Congress defined excess federal power in plain terms, reduced energy obligations due to the election by the customer to purchase power elsewhere. This language makes clear that Congress intended that excess federal power arise from decisions of DPA's customers, not the agency itself. Therefore, Bonneville violated Congress's directive by treating power it refused to sell as power that DSI has elected not to purchase. That's effectively what's happening here, Your Honor. There's no question Bonneville is required by the MSR court to report to the region what its excess federal power is. But excess federal power is specifically defined in the statute and it's not the same thing. Well, we agree that this is not excess federal power, Your Honor. We believe that Bonneville is first obligated to offer it to all of its customers within the region before it can become excess federal power. And Alcoa has not waived, in the terms of the MSR court, Alcoa has not waived the right to service from Bonneville. Can I ask one sort of question here? What happens if these, if we say that we can't, we can't modify the, the, the result? I know what the result may be in the decision, but how does this, what's the impact? Well, if the result is, though, that the court says, but during periods of time when Bonneville has surplus power, it's obligated to serve any of its regional customers, including the DSIs, then the court could conclude that Bonneville has to provide power in lieu of the, the monetary benefit. I mean, because, as opposed to other regions? As opposed to making a sale outside the region, that's correct, Your Honor. But that's just when they have surplus power. And there's no question that they have surplus power, as, as Mr. Olive indicated. There, there is that, and, and we have submitted Bonneville's calculation of surplus power in response to the MSR requirement of the court as our second motion for, to take additional motions. We wouldn't be here if the rates weren't better, if you think the surplus power than getting through the monetization benefit. Well, that's true, Your Honor. That, that is the injury to, to Alcoa. You'd rather purchase the surplus power. Yes, Your Honor. That's right. Got it. Okay. Thank you. Everybody's running over a little bit. As we like to say, as the concluding speaker, it's just you between us and the freeway. Beg your pardon, Your Honor, I didn't understand. You're standing between us and the freeway. I mean, you get to make the electrifying remarks. Yes. If Bonneville's scheme is allowed to stand, that freeway will be clogged with customers from here to San Diego wanting to buy power below cost. Good coverage. The one point I would like to make to you, Your Honor, is this. There's been discussion in Alcoa's briefing and in Bonneville's briefing about Bonneville's obligation to provide widespread, diversified use of the region's natural resources that are used to generate power. We put in with our opening brief the entire legislative history of the Project Act. That legislative history tells you the whys and the wherefores of public preference in this region under these statutes. Widespread use means widespread geographic use. Bonneville owns 80% of the transmission in this region. It's their obligation to spread it wide. It's geographic, not demographic. This is a welfare program for a very wealthy customer and a couple others, and it simply should not be allowed to continue at the expense of my clients. Okay. Thank you. Thank you. But we won't run to the freeway. Thank you all. We appreciate the briefing and the argument, as you can tell from our questions, certainly from this judge. This is a complicated area. Welcome to your world. So we appreciate the good arguments and the good briefing from all of you. Thank you very much. The case argued is submitted, and we'll stand and brief.
judges: Fisher, Berzon, Moskowitz